1

**KAYE, ROSE & PARTNERS, LLP**
Bradley M. Rose (SBN 126218)
brose@kayerose.com
Frank C. Brucculeri (SBN 137199)
fbrucculeri@kayerose.com
723 Palisades Beach Road, Suite 108
Santa Monica, CA 90402
Tel: 310-551-6555

2

3

4

5

6

Attorneys for Plaintiff
*WENZHOU DIANWANG LIGHTER
CO., LTD.*

7

8

9

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA- WESTERN DIVISION

10

11

WENZHOU DIANWANG LIGHTER
CO., LTD., a People's Republic of
China limited liability company,

12

13

            Plaintiff,

14

v.

15

FRIENDS MARKETING 2, INC., a
Delaware corporation; FRIENDS
MARKETING INC., a Florida
corporation; SCL – NIELSEN
MULTIMODAL TRANSPORT, INC., a
California corporation; HSIN SILK
ROAD SHIPPING USA, INC., a Texas
corporation; and DOES 1–20, inclusive,

16

17

18

19

20

            Defendants.

21

CASE NO.  2:22-cv-9152

**COMPLAINT FOR:**

1.  **BREACH OF CONTRACT;**

2.  **FRAUD;**

3.  **FRAUD IN EXECUTION OF MARITIME CONTRACT; AND**

4.  **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS.**

IN ADMIRALTY AND IN
   DIVERSITY

22

23

24

25

26

27

28

– 1 –

Plaintiff WenZhou Dianwang Lighter Co., Ltd. alleges:

**NATURE OF THE ACTION**

1.  This action arises from $752,296.80 in goods assembled and manufactured in the People's Republic of China ("**PRC**") by plaintiff WenZhou Dianwang Lighter Co., Ltd. ("**WenZhou**"). Those goods were delivered to defendants Friends Marketing 2, Inc. ("**Friends 2**") or Friends Marketing Inc. ("**Friends 1**"), or both as alter egos (collectively, "**Friends Marketing**"). However, Friends Marketing has not paid for those goods and has ignored all payment demands. In other words, Friends Marketing stole $752,296.80 from WenZhou. This action is to recover that stolen amount.

2.  This action also includes the goods shipping carrier, SCL – Nielsen Multimodal Transport, Inc. ("**Carrier SCL**"), and the good's freight forwarding agent, Hsin Silk Road Shipping USA, Inc. ("**Forwarder Silk Road**"). Those parties are liable for improperly releasing the goods—which were entrusted to their care—to Friends Marketing before WenZhou was paid the $752,296.80 due pre-release (as required contractually).

3.  WenZhou and Friends Marketing entered into a License and Production Agreement on April 27, 2021 ("**Production Agreement**"). The Production Agreement set forth terms and conditions for the goods WenZhou assembled and manufactured for Friends Marketing (including the use and licensing of intellectual property).

4.  The Production Agreement provides that separate purchase orders were to be entered into by WenZhou and Friends Marketing. [Production Agreement, ¶ 6].

5.  This litigation specifically involves the April 15, 2021 purchase order Friends Marketing delivered that WenZhou fulfilled under the Production Agreement by Order 1 and Order 2 described below ("**Purchase Order**"). The Purchase Order's most pertinent terms were:

///

PRODUCT NAME:        EZLight - Set of 3 USB rechargeable lighter

QUANTITY:            375,000 units (125,000 set of 3 units)

PAYMENT TERMS:       10% at order, 10% at production start, 80% against Bill of Lading

LOGISTICS TERMS:  FOB Ningbo

DELIVERY DATE:       August 9th, 2021

TOTAL AMOUNT:        USD 1,418,750.00

6.   Subsequently, before the shipment of any goods under the Purchase Order, two detailed orders were placed by Friends Marketing. Those orders resulted in a total order quantity of 375,990 for a total amount of $1,423,089 as follows:

**Order 1**

218,750 pieces (bright chrome). $3.7 per unit.

156,250 pieces (rose gold). $3.9 per unit.

Order total: 375,000 pieces with a total price of $1,418,750.

**Order 2**

580 pieces (bright chrome). $4.3 per unit.

410 pieces (rose gold). $4.5 per unit.

Order total: 990 with a total price of $4,339.

7.   Order 1 and Order 2 were combined and then broken into two shipments. The first shipment consisted of 127,560 of the 375,990 pieces ordered ("**Shipment One**"). Shipment One departed the PRC on September 1, 2021. Since payment in full for Shipment One had been made by Friends Marketing (including the $386,174.40 received on Sept. 15, 2021, as identified below), once Shipment One arrived at the Port of Los Angeles around September 25, 2021, it was released to Friends Marketing without incident.

8.   But the second shipment has not been paid in full, is the basis for this lawsuit, and is reflected by the following facts:

///

**Shipment 2 ("Shipment Two")**

248,385 pieces were shipped.

$940,483 total amount of shipped goods.

Shipment Two departed the PRC on September 3, 2021. It was shipped on the vessel Louise Auerbach ("**Vessel**") in two containers bearing container numbers LYGU3535740 and LYGU3535884 ("**Shipped Containers**"). The Port of San Diego was its original destination. But the destination port was changed to the Port of Los Angeles.

9.  WenZhou fulfilled all contractual obligations under the Purchase Order.

10. In contrast, Friends Marketing failed to pay and continues to refuse to pay WenZhou $752,296.80 (plus interest) ("**Outstanding Balance**"). The Outstanding Balance reflects the outstanding 80% due WenZhou for the $940,483 Shipment Two. The Outstanding Balance is calculated based on the following payments received by WenZhou made by Friends Marketing under the Purchase Order:

(1)  $70,936 received on April 19, 2021 (5% deposit calculated off Order 1).

(2)  $212,812.50 received on May 27, 2021 (15% deposit calculated off Order 1).

(3)  $867.80 received on June 17, 2021 (20% deposit calculated off Order 2).

(4)  $386,174.40 received on September 15, 2021 (80% balance calculated off Shipment One).

After the application of the above four payments, the Outstanding Balance of $752,296.80 remained due and owing prior to the release of Shipment Two to Friends Marketing.

11. Shipment Two was only to be released to Friends Marketing after payment of the outstanding 80% due and tender of the original Bill of Lading. On current information and belief, Shipment Two was released after January 21, 2022, to

Friends Marketing by the freight forwarder without Friends Marketing tendering the original Bill of Lading (as defined below). That was in violation of the Production Agreement's terms. Friends Marketing has since refused to pay plaintiff WenZhou the Outstanding Balance and has ignored all reasonable attempts to address this outstanding debt.

12. WenZhou now alleges four causes of action. Against Friends 1, Friends 2, and DOES 1-10, Weh Zhou alleges two causes of action:

- Breach of contract, and
- Fraud and conspiracy to commit fraud.

Against Carrier SCL and DOES 11-15, WenZhou alleges three causes of action:

- Fraud and conspiracy to commit fraud,
- Fraud in the execution of a maritime contract, and
- Intentional interference with contractual relations.

Against Forwarder Silk Road and DOES 1-20, WenZhou alleges two causes of action:

- Fraud and conspiracy to commit fraud, and
- Intentional interference with contractual relations.

**PARTIES**

13. Plaintiff WenZhou is a limited liability company organized under PRC law. WenZhou's principal business is manufacturing goods for export like those ordered by Friends Marketing under the Purchase Order. WenZhou's principal place of business is 6 Ningmeng Road, Ouhai Economic Development Area, Wenzhou, PRC.

14. Defendant Friends 2 is a Delaware corporation incorporated on September 25, 2020. Its principal place of business is 6 Central Row, Floor 4, Hartford, Connecticut, 06103. It operates in Connecticut under a Certificate of Authority with a North American Industry Classification System code number 42 (Wholesale

Trade), with a NAICS subcode number 423990 (Other Miscellaneous Durable Goods Merchant Wholesalers).

15.   Defendant Friends 1 is a Florida corporation incorporated on May 29, 2003. Its principal place of business is also 6 Central Row, Floor 4, Hartford, Connecticut, 06103. But Friends 1's Certificate of Authority to operate in Connecticut was revoked by the State of Connecticut on August 16, 2022.

16.   Plaintiff WenZhou is informed and believes that at all times relevant to this complaint, the business entity acts complained of were performed by an employee, agent, officer, servant, or representative of the entity being sued.

17.   Forwarder Silk Road is a Texas corporation with a principal place of business in Sugar Land, Texas.

18.   Carrier SCL is a California corporation with a principal place of business in Ontario, California.

19.   The true names and capacities of DOES 1 through 20, inclusive, whether individual, corporate, associate, or otherwise, are unknown to plaintiff WenZhou. Plaintiff WenZhou therefore sues DOES 1 through 20 by such fictitious names. But plaintiff WenZhou is informed and believes that each DOE defendant sued is responsible in some manner for the practices, acts, conduct, and occurrences alleged in this complaint. Each DOE Defendant was either an actual perpetrator or co-conspirator, aider and abettor, officer, director, or managing agent with the knowledge, control, authority, direction, or ratification of each other defendant. Plaintiff WenZhou will seek leave of this Court to amend this complaint to allege the true names and capacities of each DOE defendant, and the roles each named DOE defendant played in the wrongdoing alleged as each DOE defendant is identified and the manner of participation in the wrongful conduct described in this complaint is ascertained.

20.   At all relevant times (as alleged more fully in this complaint), each defendant acted as an alter ego of the other defendant. In doing the acts alleged,

each defendant acted within the scope and course of that alter ego and with the permission and consent of each defendant.

21.   At all times relevant to this complaint, each defendant participated and acted—as the agent, employee, or representative of each other—with or in furtherance of the conspiracies alleged more fully in this complaint. Each defendant is sued individually as a principal, participant, aider and abettor, and co-conspirator in the wrongful conduct complained of. The liability of each defendant arises from the fact that each engaged in all or part of the wrongful acts, plans, schemes, conspiracies, or improper transactions complained of.

## JURISDICTION, VENUE, AND GOVERNING LAW

22.   As to Friends 1 and Friends 2, this action is within this Court's diversity jurisdiction under 28 U.S.C. §1332. Both requirements of 28 U.S.C. §1332 are satisfied. The amount in controversy is greater than $75,000, as plaintiff WenZhou suffered business losses of at least $752,296.80. There is complete diversity of citizenship between plaintiff WenZhou and all named defendants. Plaintiff WenZhou is not a citizen of the same state as any defendant (including Friends 1 and Friends 2). Specifically, plaintiff WenZhou is a PRC limited liability company, with a principal place of business in Ningmeng Road, Ouhai Economic Development Area, Wenzhou, PRC. Friends 2 is a Delaware corporation, with its principal place of business in Hartford, Connecticut. Friends 1 is a Florida corporation, with its principal place of business in Hartford, Connecticut. No member of plaintiff WenZhou (as a limited liability company) is a citizen of Connecticut, California, or Texas.

23.   As to Carrier SCL and Forwarder Silk Road, this is an action within this Court's admiralty jurisdiction under 28 U.S.C. §1333 and 28 U.S.C. §1331(1). This action involves an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. Under 28 U.S.C. § 1333, the Federal District Court has original and exclusive jurisdiction over those causes of action. That

admiralty jurisdiction is based on the Bill of Lading (identified below). That Bill of Lading is a maritime contract for the transport of marine intermodal containers from the PRC to the United States and cargo loaded in said containers (which is maritime property).

24.   This Court has supplemental jurisdiction over any common law claims pursuant to 28 U.S.C. §1367.

25.   All defendants are subject to the personal jurisdiction of this Court. At all relevant times, each defendant transacted, solicited, and conducted business in California through its employees, agents, or representatives, and derived substantial revenue from that California commence. Also, significant events giving rise to this action occurred in this judicial district (for instance, the unloading of the goods overseen by Forwarder Silk Road and the good's transfer via Carrier SCL, all for the commercial benefit of Friends 1 or Friends 2 (or both).

26.   Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. §1391(b)(2). The containerized cargo consisting of the goods not paid for—listed in the Bill of Lading and identified below—was to be discharged at the Port of San Diego, California, located within this Federal judicial district.

27.   Although the Production Agreement states that *any controversy or claim arising out of or in connection with this Agreement or the breach, termination or invalidity thereof* ("**Dispute**") is to be *submitted to the Shanghai International Arbitration Center [] to be finally settled by arbitration in accordance with the Rules of that Centre by sole arbitrator appointed in accordance with those Rules*, plaintiff WenZhou waives the right to that arbitration. Plaintiff WenZhou also attempted to resolve this Dispute *through friendly consultations between the Parties* (as described more fully below).

28.   Finally, the Production Agreement states that it *shall be governed by and construed according to the laws of the PRC*. The applicable PRC commercial code

laws are modeled on the Uniform Commercial Code and can be applied by this Court. Alternatively, California state law can be applied to adjudicate the applicable causes of action (which substantially mirror corresponding applicable PRC law).

### ADDITIONAL MATERIAL FACTS TO ALL CLAIMS

29. Plaintiff WenZhou, through its affiliate WenZhou Huahong Trade, Co. Ltd., was the shipper of two intermodal marine containers—the Shipped Containers—transported over navigable waters aboard the Vessel pursuant to the bill of lading bearing number SCLNHSRSDI20561. The initial Bill of Lading had the Port of San Diego as the destination port. That initial bill of lading is attached to this complaint as *Exhibit A*, and is made part of this complaint. On information and belief, the initial bill of lading port of discharge was changed from the Port of San Diego to the Port of Los Angeles after departure from the PRC. That changed bill of lading is attached as *Exhibit B*, and is also made part of this complaint. *Exhibit A* is defined as the "**Bill of Lading**" (subject to WenZhou's reservation of rights and further investigation of the facts regarding the final, binding Bill of Lading whose original had to be presented before the release of Shipment Two to Friends Marketing as described in this complaint).

30. The Shipped Containers bore maritime identifying numbers LYGU3535740/17609339 and LYGU3535884/17609340. [*Exhs. A & B*.] The Shipped Containers contained the goods at issue in this action ("**Stolen Goods**"). [*Exhs. A & B*.] The Stolen Goods consist of Shipment Two's 248,385 ARC electric lighter pieces in 2070 containing. [*Exhs. A & B*.]

31. Friends 2 was the consignee of the Shipped Containers. [*Exhs. A & B*.].

32. Carrier SCL was the maritime carrier, as indicated by the Bill of Lading. [*Exhs. A & B*.]

33. Forwarder Silk Road was the agent for Carrier SCL in the United States.

///

///

34.   On or about September 3, 2021, the Shipped Containers (containing the Stolen Goods) were loaded onto the Vessel at the Port of Ningbo, PRC, and shipped to the United States under the Bill of Lading. [*Exhs. A & B.*]

35.   All freight charges were prepaid. [*Exhs. A & B.*]

36.   The Bill of Lading was issued by Carrier SCL (as the carrier) for the benefit of Friends Marketing (as consignee entitled to delivery). But by the Bill of Lading, Carrier SCL also promised and agreed to deliver the Stolen Goods carried under the Bill of Lading from the PRC to the United States only to Friends Marketing on the presentation by Friends Marketing of the original Bill of Lading in exchange for the release of the Stolen Goods. As the Bill of Lading—by its terms—only authorized Carrier SCL (and any authorized agent) to release the Stolen Goods shipped via the Shipped Containers to Friends Marketing only on presentation of the original Bill of Lading, the Bill of Lading, the original Bill of Lading requirements protected plaintiff WenZhou from any failure by Friends Marketing to pay the $752,296.80 due (and remaining outstanding).

37.   Plaintiff WenZhou and Friends Marketing did engage in discussions regarding the telex release of the Bill of Lading. Based on representations made by Friends Marketing to plaintiff WenZhou assuring payment before the Stolen Goods were released to Friends Marketing, plaintiff WenZhou sent a telex release of the Bill of Lading in advance to Forwarder Silk Road to hold (which reflected the Port of San Diego as the port of discharge. Before the Vessel arrived in port, plaintiff WenZhou instructed Forwarder Silk Road to cancel the telex release of the Bill of Lading.

38.   On information and belief, the Vessel berthed at the Port of Los Angeles on or about January 21, 2022 —not the Port of San Diego as stated under the initial Bill of Lading. On information and belief, the Shipped Containers were then discharged from the Vessel.

///

39.   Because the telex release of the Bill of Lading had been canceled before the Vessel arrived in port, the Stolen Goods were to be delivered to and received by Friends Marketing only upon presentation of the original Bill of Lading. That meant WenZhou had to be paid by Friends Marketing for the Stolen Goods before the Stolen Goods were delivered into Friends Marketing's possession and control.

40.   Plaintiff WenZhou repeatedly confirmed with Forwarder Silk Road that the Stolen Goods could only be released to consignee Friends Marketing after the original Bill of Lading was received. Forwarder Silk Road reassured plaintiff WenZhou that Friends Marketing could not take possession of the Stolen Goods without the original Bill of Lading.

41.   However, Forwarder Silk Road and Carrier SCL systematically released the Stolen Goods to Friends Marketing without requiring Friends Marketing to tender the original Bill of Lading in exchange (as contractually required). This was done without plaintiff WenZhou's consent or knowledge.

42.   On information and belief, plaintiff WenZhou alleges that Carrier SCL made or directed the release of the Stolen Goods without requiring the presentation of the original Bill of Lading. Carrier SCL took or directed those wrongful acts knowing at all times that Friends Marketing had not paid the Outstanding Balance and thus was not entitled to take possession and control of the Stolen Goods when it did. Carrier SCL took or directed those wrongful acts knowing at all times that plaintiff WenZhou had no knowledge of the release without payment (or the reasonable ability to obtain that knowledge). Carrier SCL also knew (or had reason to know) that plaintiff WenZhou would suffer substantial damages due to the authorized release of the Stolen Goods to Friends Marketing without presentation of the original Bill of Lading. In doing so, Carrier SCL negligently, knowingly, and intentionally participated in the fraud committed against plaintiff WenZhou.

43.   On information and belief, plaintiff WenZhou makes all allegations in this paragraph. Carrier SCL made or directed the release of the Stolen Goods without

requiring the presentation of the original Bill of Lading. Carrier SCL took or directed those wrongful acts knowing at all times that Friends Marketing had not paid the Outstanding Balance and thus was not entitled to take possession and control of the Stolen Goods when it did. Carrier SCL took or directed those wrongful acts knowing at all times that plaintiff WenZhou had no knowledge of the release without payment (or the reasonable ability to obtain that knowledge). Carrier SCL also knew (or had reason to know) that plaintiff WenZhou would suffer substantial damages due to the authorized release of the Stolen Goods to Friends Marketing without presentation of the original Bill of Lading. In doing so, Carrier SCL negligently, knowingly, and intentionally participated in the fraud committed against plaintiff WenZhou.

44.    On information and belief, plaintiff WenZhou makes all allegations in this paragraph. In the ordinary course of its duties as the forwarding agent for Friends Marketing, Forwarder Silk Road made or directed the release of the Stolen Goods without requiring the presentation of the original Bill of Lading. Forwarder Silk Road took or directed those wrongful acts knowing at all times that Friends Marketing had not paid the Outstanding Balance and thus was not entitled to take possession and control of the Stolen Goods when it did. Forwarder Silk Road took or directed those wrongful acts knowing at all times that plaintiff WenZhou had no knowledge of the release without payment (or the reasonable ability to obtain that knowledge). Forwarder Silk Road also knew (or had reason to know) that plaintiff WenZhou would suffer substantial damages due to the authorized release of the Stolen Goods to Friends Marketing without presentation of the original Bill of Lading. In doing so, Forwarder Silk Road knew that it was actively participating in defrauding plaintiff WenZhou.

45.    On information and belief, plaintiff WenZhou makes all allegations in this paragraph. In lieu of requiring Friends Marketing to present the original Bill of Lading prior to Stolen Goods's release, Friends Marketing tendered to Forwarder

Silk Road an indemnification letter. By that indemnification letter, Friends Marketing promised to indemnify Forwarder Silk Road for any claims asserted against it in connection with the release of the Stolen Goods to Friends Marketing. In consideration of that indemnification letter, Forwarder Silk Road released the Stolen Goods to Friends Marketing.

46.   On information and belief, plaintiff WenZhou makes all allegations in this paragraph. In accepting Friends Marketing's indemnification letter in consideration for releasing the Stolen Goods to Friends Marketing without presentation of the original Bill of Lading, Forwarder Silk Road actively defrauded plaintiff WenZhou. Forwarder Silk Road knew or had reason to know that plaintiff WenZhou would be forced to chase Friends Marketing to collect the Outstanding Balance, without any certainty of future payment (which—in fact, has occurred—as this litigation establishes).

47.   At all times relevant to this complaint, both Carrier SCL and Forwarder Silk Road were aware that their release of the Stolen Goods to Friends Marketing without presentation of the original Bill of Lading represented both a breach of the Bill of Lading's terms and fraud on plaintiff WenZhou. That is because they knew that plaintiff WenZhou would not authorize the release of the Stolen Goods to Friends Marketing before payment in full of the Outstanding Balance.

48.   At all times relevant to this complaint, plaintiff WenZhou had no reasonable way of knowing and no reasonable means of discovering that Carrier SCL and Forwarder Silk Road were engaging in the acts they took in releasing the Stolen Goods to Friends Marketing without the original Bill of Lading having been presented by Friends Marketing first.

49.   Plaintiff WenZhou only learned of the fraudulent release of the Stolen Goods to Friends Marketing after the release had occurred.

50.   As of this complaint's filing date, Friends Marketing (nor anyone on its behalf) has paid any of the $752,296.80 (plus interest) due under the Purchase

Order for the Stolen Goods. That despite the fact that Friends Marketing accepted and took possession of the Stolen Goods. WenZhou has repeatedly contacted Friends Marketing, demanding payment to resolve the Dispute. But Friends Marketing has ignored all attempts to do so.

51. What is more, based on information and belief, Friends Marketing has or is in the process of selling all the Stolen Goods for an additional profit about the Outstanding Balance amount.

52. Regarding alter ego, defendant Friends 2 was at all times for this complaint's purposes Friends 1's alter ego. There exists—and during all times acts were taken by one or both of the Friends Marketing defendants, there existed—a unity of interest and ownership between Friends 2 and Friends 1. That unity of ownership and interest resulted in Friends 2 and Friends 1 being completely controlled, operated, dominated, and managed in a manner that any separateness between Friends 2 and Friends 1 ceased.

53. Even more specifically, and on information and belief, Friends 2 and Friends 1 share common shareholders and controlling persons. On information and belief, plaintiff WenZhou alleges John Burbank is Friends 1's and Friends 2's largest shareholder. Burbank is listed as Friends 2's President on the entity's current Connecticut Certificate of Authority. Garold Miller is the second of three shareholders for each Friend 1 and Friend 2. Miller is also identified as Friends 1's President on Friends 1's latest Florida annual report filing (March 15, 2022, document no. 7666603465CC). Plaintiff WenZhou further alleges on its information and belief that Garold Miller is responsible for each contract that Friends 1 and Friends enter into and the completion of each contract.

54. Also, at all times relevant to this complaint, through the actions of Garold Miller and John Burbank, the following occurred:

- Friends 1 and Friends 2 were jointly managed to commit the wrongdoing alleged in this complaint;

- Friends 1 and Friends 2 had their corporate formalities disregarded, and an arm's length relationship between the entities was not maintained;
- Friends 1 and Friends 2 used the same office and business location and employed the same employees for the corporate entities;
- Friends 1 and Friends 2, even though separate corporate entities in name, were utilized to procure goods for each other; and
- The assets of Friends 1 and Friends 2 were manipulated between the two entities to concentrate the assets in one entity (believed to be Friends 2) and the liabilities in another entity (here, the attempt being to do so in Friends 1).

55.   As a result, at all times relevant under this complaint, Friends 1 and Friends 2 were not only influenced and governed by John Burbank and Garold Miller in unison to pursue the wrongful actions alleged, there was a unity of interest and ownership that resulted in the Friends 1 and Friends 2 ceasing to have entity separateness in fact. The facts thus demonstrate that adherence to the fiction of separate entity existence would, under the particular circumstances before this Court, sanction an impermissible fraud and promote injustice.

56.   Regarding agency, aiding and abetting, and conspiracy, in performing the acts alleged in this complaint, each defendant acted within the course and scope of its agency (including employment and representative capacity) with the full knowledge, consent, permission, authorization, and ratification of each other defendant (whether express or implied). Each defendant participated and acted with or in furtherance of the conspiracies alleged. That includes aiding or assisting in carrying out the purposes of the conspiracies alleged. Each defendant performed acts and made statements in furtherance of the conspiracies alleged and other violations of applicable law.

57.   Each defendant acted both individually and in alignment with the other defendants with full knowledge of their wrongful conduct. As a result, the

defendants conspired together and built upon each other defendant's wrongful conduct to accomplish the damaging acts committed against plaintiff WenZhou (as described in this complaint).

**LEGAL CLAIMS**

**First Cause of Action**

***Breach of Contract***

**(Against Friends 1, Friends 2, and DOES 1-10)**

58.   Plaintiff WenZhou's first cause of action is *breach of contract* against Friends 1, Friends 2, and DOES 1-10.

59.   For purposes of this first cause of action, plaintiff WenZhou re-alleges all allegations set forth in paragraphs 1 through 57 of this complaint.

60.   The Production Agreement and the Purchase Order are valid, binding agreements between plaintiff WenZhou and Friends Marketing. Those documents are the basis for both plaintiff WenZhou's and Friends Marketing's respective contractual obligations and performance at issue in this litigation.

61.   The Production Agreement's section 6.4 imposes the following payment obligations on Friends Marketing:

Subject to the terms of this Agreement, Friends Marketing will, after 30 days from its receipt of the relevant invoice from [plaintiff WenZhou], pay the prices for the Licensed Products, in the manner as stated in the relevant purchase order. If no payment schedule is specified in the relevant purchase order, payment shall be made in installments as follows:

(a) 10% of the total order amount as advance shall be paid by T/T after the Licensed Products has passed independent laboratory testing that comply with according US commodity regulations;

(b) 10% of the total order amount shall be paid by T/T after the Producer starts the production or assembly of the Licensed Products.

(c) The remaining [80%] of the total order amount shall be paid by T/T after completion of production and the Licensed Products has passed inspection carried out by Friends Marketing pursuant to Section 8 hereof against presentation of the Bill of Lading and other documentation reasonably required by Friends Marketing to facilitate collection of the Licensed Products, including but not limited to commercial invoice, packing list, certificate of origin and quality certificate.

62.   Because the Purchase Order did not specify a payment schedule, the Purchase Agreement's section 6.4, clauses (a)-(c) set forth in the preceding paragraph applied to Friends Marketing for the Stolen Goods. Friends Marketing made the 10% payment for the Stolen Goods required by that clause (a). Friends Marketing also made the 10% payment for the Stolen Goods required by that clause (b).

63.   However, it is section 6.4's clause (c) payment of 80% of the invoiced amount that Friends Marketing failed to make. That clause states in pertinent part that *The remaining [80%] of the total order amount shall be paid by [Friends Marketing] after completion of production and the Licensed Products has passed inspection carried out by Friends Marketing pursuant to Section 8 hereof against presentation of the Bill of Lading...* The Outstanding Balance of $752,296.80 (plus interest now) is that remaining 80%.

64.   Plaintiff WenZhou performed all of its obligations under the Production Agreement and Purchase Order. Those documents control the binding transaction terms at issue in this first cause of action. Plaintiff WenZhou's full performance is evidenced by the delivery of the Stolen Goods as reflected by the Bill of Lading.

65.   In contrast, by their past and ongoing acts and omissions, Friends Marketing and DOES 1-10 are in breach of their obligations under the Production Agreement and Purchase Order.

66.   Friends Marketing and DOES 1-10 have materially breached the Production Agreement and Purchase Order by failing to pay the Outstanding Balance in accordance with the Production Agreement's section 6.4, clause (c). That is, Friends Marketing impermissibly took possession of the Stolen Goods prior to payment of the Outstanding Balance. Plaintiff WenZhou never waived Friends Marketing's payment obligations under the Production Agreement's section 6.4, clause (c), nor did it consent to Friends Marketing taking possession and control of the Stolen Goods prior to the original Bill of Lading's presentment to Carrier SCL or Forwarder Silk Road.

67.   As a direct and proximate result of Friends Marketing's and DOES 1-10 breach of the Production Agreement's terms and the Purchase Order's terms, plaintiff WenZhou has suffered damages of at least $752,296.80 (plus interest).

68.   Friends Marketing's and DOES 1-10 breach of the Production Agreement's terms and the Purchase Order's terms was a substantial factor in causing plaintiff WenZhou's damages.

69.   Plaintiff WenZhou is entitled to an award of compensatory damages for breach of contract in an amount to be determined at the time of trial, according to proof. But that amount is not less than $752,296.80, plus interest at the maximum legal rate (running from approximately January 21, 2022), attorneys' fees incurred, and costs of suit incurred.

## Second Cause of Action

### *Fraud and Conspiracy to Commit Fraud*

### (Against all defendants)

70.   Plaintiff WenZhou's second cause of action is *fraud and conspiracy to commit fraud* against all defendants.

71.   For purposes of this second cause of action, plaintiff WenZhou re-alleges all allegations set forth in paragraphs 1 through 57 and 60 through 69 of this complaint.

72.  Friends 1, Friends 2, and DOES 1-10—prior to and after entering into the Production Agreement and Purchase Order—represented to plaintiff WenZhou that it would pay the Outstanding Balance prior to taking possession of the Stolen Goods. Those promises were in exchange for plaintiff WenZhou producing the Stolen Goods and allowing them to be shipped to the United States for Friends 1's, Friends 2's, and DOES 1-10's benefit. Those representations were false, and Friends 1, Friends 2, and DOES 1-10 knew they were false when made.

73.  Plaintiff WenZhou reasonably relied on Friends 1's, Friends 2's, and DOES 1-10's representations regarding payment of the Outstanding Balance. Friends Marketing originally held itself out as a trustworthy customer. Friends Marketing then induced plaintiff WenZhou into a vulnerable relationship for Shipment Two's 248,385 pieces assembled, manufactured, and delivered by plaintiff WenZhou for and to Friends Marketing. Friends Marketing did that by paying $670,792 to WenZhou on account of Order 1 and Order 2, including $386,174.40 to have Shipment One released to Friends Marketing.

74.  And as just one example of fraudulent inducement, in response to a September 29, 2021 email demanding payment for then-at-sea Shipment Two, Remi Honore (a Friends Marketing agent) responded via email on September 30, 2021, with reassurance that payment would be made. Honore's email included the inducing statement that "Please be reinsured, you are a strategic partner to us and we want to develop a long term relationship with you ….I'm confident [payment] will be solved at least early next week since the [Vessel] is supposed to arrive Oct 4."

75.  When it came to Shipment Two, at the time Friends Marketing made its statements and representations to plaintiff WenZhou about payment of the $752,296.80 outstanding balance for Shipment Two, plaintiff WenZhou was ignorant of the falsity of the statements and representations. Instead, plaintiff WenZhou reasonably believed Friends Marketing's assurances about payment to be

true and had no knowledge of, or reason to suspect, the true facts. In actual and justifiable reliance upon such statements and representations, plaintiff WenZhou was induced to and did manufacture, assemble, and deliver the Stolen Goods. Plaintiff WenZhou then ensured those goods were shipped to the United States under the Bill of Lading.

76.   Had plaintiff WenZhou known the actual, true facts, it would not have assembled, manufactured, and delivered all the units produced under the Purchase Order (including the Stolen Goods).

77.   Plaintiff WenZhou's reliance upon the statements and representations of Friends 1, Friends 2, and DOES 1-10 promising payment for the Stolen Goods was reasonable and justifiable in that plaintiff WenZhou had no knowledge or reason to suspect or believe that those fraudulent statements and representations were not true. The true facts were solely within the knowledge of Friends 1, Friends 2, and DOES 1-10.

78.   Friends 1, Friends 2, and DOES 1-10 never intended to pay WenZhou the Outstanding Balance after paying for the first two shipments.

79.   Plaintiff WenZhou was harmed by those fraudulent representations and inducements.

80.   Plaintiff WenZhou's reliance on Friends 1's, Friends 2's, and DOES 1-10's representations was a substantial factor in causing plaintiff WenZhou harm.

81.   Carrier SCL, Forwarder Silk Road, and DOES 11-20 all conspired with Friends 1, Friends 2, and DOES 1-10 to defraud plaintiff WenZhou, and did, in fact, commit fraud by assisting each other in knowingly and intentionally causing the Stolen Goods to be released to Friends Marketing without presentation of the original Bill of Ladings. Those parties engaged in that wrongful conduct knowing that Friends Marketing did not intend ever to pay plaintiff WenZhou the Outstanding Balance (or did so having the reasonable ability to obtain that knowledge about Friends Marketing's intent).

82.   Friends 1's, Friends 2's, Carrier SCL's, Forwarder Silk Road's, and DOES 1-20's wrongful acts, individually and collectively, were done maliciously, oppressively, and with intent to defraud. Plaintiff WenZhou is thus entitled to punitive and exemplary damages in the amount not less than $250,000, compensatory damages in an amount not less than $752,296.80, with the final amounts to be determined at trial according to proof, plus attorneys' fees and costs of suit.

## Third Cause of Action

### *Fraud in the Execution of Maritime Contract*

### **(Against Carrier SCL and DOES 11-15)**

83.   Plaintiff WenZhou's third cause of action is *Fraud in the Execution of Maritime Contract* against Carrier SCL and DOES 11-15.

84.   For purposes of this third cause of action, plaintiff WenZhou re-alleges all allegations set forth in paragraphs 1 through 57, 60 through 68, and 72 through 80 of this complaint.

85.   The Carriage of Goods by the Sea Act ("**COGSA**") establishes duties ocean carriers must comply with in their transport of goods. [See section 4(5), Ch. 229, 49 Stat. 1207 (1936), reprinted in the note following 46 U.S.C. § 30701].

86.   Likewise, the general maritime law of the United States imposes a duty on Carrier SCL as an ocean carrier to safely and prudently load, stow, secure, carry, and deliver the cargo to the consignee or other party duly entitled to delivery of the goods.

87.   In consideration for specified fees and charges, Carrier SCL and DOES 11-15 each agreed to transport the Stolen Goods in the Shipped Containers from the PRC to the United States and to deliver that cargo to Forwarder Silk Road—or Forwarder Silk Road's customer, Friends Marketing—only on presentation of the original Bill of Lading (or binding, express written instruction to the contrary).

88.   Despite the obligations imposed on Carrier SCL by COGSA or the General Maritime Laws of the United States (or both) to only deliver the Shipped Container's cargo (the Stolen Goods) to Forwarder Silk Road or Forwarder Silk Road's customer (Friends Marketing) on the presentation by Friends Marketing of the original Bill of Lading, Carrier SCL knowingly and willfully ignored its obligations and released plaintiff WenZhou's cargo to Friends Marketing without the presentation of the original Bill of Lading and without plaintiff WenZhou's knowledge or consent. On information and belief, in doing so, Carrier SCL knew that plaintiff WenZhou had no way of knowing that Carrier SCL was releasing the cargo to Friends Marketing. Carrier SCL also knew (or should have known) that plaintiff WenZhou would suffer damages and financial harm as a result of the unauthorized and fraudulent release of the cargo to Friends Marketing.

89.   On information and belief, Carrier SCL knew that its unauthorized delivery of plaintiff WenZhou's cargo to Friends Marketing was in breach of Carrier SCL's contractual and legal obligations to plaintiff WenZhou. Yet Carrier SCL continued to engage in the deceptive practice of improperly and fraudulently releasing the cargo to Friends Marketing (without first presenting the original Bill of Lading) to continue to earn and collect freight charges from Friends Marketing on future shipments.

90.   As a direct and proximate result of Carrier SCL's fraudulent actions, plaintiff WenZhou has been unable to recover the Outstanding Balance due from Friends Marketing for the Stolen Goods. Friends Marketing refuses to now pay for the Stolen Goods, having already received them from Carrier SCL without first tendering the Outstanding Balance to plaintiff WenZhou. Plaintiff WenZhou has attempted to mitigate its damages by demanding full payment from Friends Marketing for the amounts owed in connection with Carrier SCL's unauthorized release of the cargo to Friends Marketing. But as the first cause of action demonstrates, plaintiff WenZhou has thus far been unsuccessful. Carrier SCL's

conduct in knowingly and willfully ignoring its obligations to plaintiff WenZhou and fraudulently releasing the cargo to Friends Marketing will be fatal to plaintiff WenZhou's prospects to recover the Outstanding Balance from Friends Marketing if the other defendants lack the assets to pay a judgment entered in this litigation.

91.   Under the circumstances, Carrier SCL is legally obligated to make plaintiff WenZhou whole on account of Friends Marketing's failure to pay for the goods that were fraudulently delivered to Friends Marketing. That damage amount is to be determined at the time of trial, according to proof. But that amount is not less than $752,296.80, plus interest at the maximum legal rate (running from approximately January 21, 2022), attorneys' fees incurred, and costs of suit incurred.

**Fourth Cause of Action**

***Intentional Interference with Contractual Relations***

**(Against Carrier SCL, Forwarder Silk Road, and DOES 1-20)**

92.   Plaintiff WenZhou's third cause of action is *Intentional Interference with Contractual Relations* against Carrier SCL, Forwarder Silk Road, and DOES 1-20.

93.    For purposes of this fourth cause of action, plaintiff WenZhou re-alleges all allegations set forth in paragraphs 1 through 57, 60 through 68, 72 through 80, and 84 through 89 of this complaint.

94.   The Production Agreement and the Purchase Order are valid, binding agreements between plaintiff WenZhou and Friends Marketing.

95.   Carrier SCL, Forwarder Silk Road, and DOES 1-20 all knew that those contracts existed and the terms of those contracts (or had reason to know of the terms based on the Bill of Lading).

96.   Carrier SCL, Forwarder Silk Road, and DOES 1-20 conduct and actions in allowing the Stolen Goods to be released to Friends Marketing before payment of the Outstanding Balance occurred were unjustified. Those defendants knew (or had reason to know) that payment was contractually required before the Stolen Goods' release to Friends Marketing and that plaintiff WenZhou had not authorized that

release before payment of the Outstanding Balance. Carrier SCL, Forwarder Silk Road, and DOES 1-20 also knew (or had reason to know) that the original Bill of Lading had not been presented by Friends Marketing. Carrier SCL's, Forwarder Silk Road's, and DOES 1-20's unjustified actions and conduct associated with the Stolen Goods' release to Friends Marketing before payment of the Outstanding Balance knowingly prompted a breach of contract that allowed Friends Marketing to fail to perform its obligation to pay the Outstanding Balance (and allowed that breach to become ongoing, which it remains).

97.   Carrier SCL, Forwarder Silk Road, and DOES 1-20 all had the requisite intention to disrupt the full performance of the Production Agreement and the Purchase Order to the detriment of plaintiff Silk Road.

98.   As a result of Carrier SCL's, Forwarder Silk Road's, and DOES 1-20's conduct and actions—that knowingly allowed or caused the Stolen Goods to be released to Friends Marketing before payment of the Outstanding Balance occurred—harmed plaintiff WenZhou in an amount in excess of $752,296.80.

99.   Carrier SCL's, Forwarder Silk Road's, and DOES 1-20's wrongful conduct was a significant factor that caused plaintiff WenZhou's business harm and damage.

100. Plaintiff WenZhou is thus entitled to damages in the amount not less than $752,296.80, with the final amount to be determined at trial according to proof, plus attorneys' fees and costs of suit.

### PRAYER FOR RELIEF

101. Plaintiff WenZhou prays for judgment as follows:

For the first cause of action against Friends 1, Friends 2, and DOES 1-10, jointly and severally,

      a.  Judgment in a total sum not less than $752,296.80, plus pre-judgment interest, according to proof on account of damages suffered;

      b.  Interest on the damage amount awarded to plaintiff WenZhou at the maximum legal rate;

      c.  Award plaintiff WenZhou its attorneys' fees and costs incurred in and relating to this action in an amount according to contract or proof; and

      d.  Grant plaintiff WenZhou all further relief in its favor that the Court determines is just and fair.

For the second cause of action against all defendants,

      a.  Judgment in a total sum not less than $752,296.80, plus pre-judgment interest, according to proof on account of damages suffered.

      b.  Interest on the damage amount awarded to plaintiff WenZhou at the maximum legal rate;

      c.  Award plaintiff WenZhou its attorneys' fees and costs incurred in and relating to this action in an amount according to contract or proof;

      d.  Punitive damages according to proof, but not less than $250,000; and

      e.  All further relief in plaintiff WenZhou's favor that the Court determines is just and fair.

For the third cause of action against Carrier SCL and DOES 11-15,

      a.  Judgment in a total sum not less than $752,296.80, plus pre-judgment interest, according to proof on account of damages suffered.

      b.  Interest on the damage amount awarded to plaintiff WenZhou at the maximum legal rate;

      c.  Award plaintiff WenZhou its attorneys' fees and costs incurred in and relating to this action in an amount according to contract or proof;

      d.  Punitive damages according to proof, but not less than $250,000; and

      e.  All further relief in plaintiff WenZhou's favor that the Court determines is just and fair.

For the fourth cause of action against Carrier SCL, Forward Silk Road, and DOES 1-20,

      a.  Judgment in a total sum not less than $752,296.80, plus pre-judgment interest, according to proof on account of damages suffered.

b.  Interest on the damage amount awarded to plaintiff WenZhou at the maximum legal rate;

c.  Award plaintiff WenZhou its attorneys' fees and costs incurred in and relating to this action in an amount according to contract or proof; and

d.  All further relief in plaintiff WenZhou's favor that the Court determines is just and fair.

Dated: December 16, 2022                          Respectfully submitted,
                                                  KAYE, ROSE & PARTNERS, LLP


                                          By:     /s/ Frank C. Brucculeri
                                                  Frank C. Brucculeri, Esq.
                                                  *Attorneys for Plaintiff*